IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

KRON-CIS GmbH,

                    Plaintiff

          vs.                                    Case No. 12-1473-SAC

LS INDUSTRIES, INC.,

                    Defendants.


MEMORANDUM AND ORDER

          The plaintiff aptly summarizes this case as a buyer's "breach of
contract case [that] arises from the sale of an internal shot blaster system"
("System") manufactured by the defendant LS Industries, Inc. ("LS") and
sold to Kron-CIS, GMBH, a German corporation, ("Kron"). (Dk. 150, p. 1).
Among the asserted contractual breaches, Kron alleges LS failed "to deliver
the internal shot blaster system in accordance with the schedule set forth in
the contract and in accordance with the contract's specifications." (Dk. 150,
pp. 1-2; Dk. 156, p. 1). Kron moves for partial summary judgment on its
claims for breach of contract in failure to deliver the System by the date
appearing in the written contract and for the remedy of revocation of
acceptance based on allegations of the System's nonconformity having
substantially impaired the System's value to Kron. (Dks. 149 and 150). LS
also has filed a motion for partial summary judgment against Kron's claims

for punitive damages, for fraud and misrepresentation, and for any damages. (Dks. 147 and 148).

Rule 56 authorizes a court to "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material if it would affect the outcome of a claim or defense under the governing law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "[T]he dispute about a material fact is "genuine, . . ., if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*. The essential inquiry is "whether the evidence presents a sufficient disagreement to require submission to the jury or whether the evidence is so one sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby*, 477 U.S. at 251-52. The summary judgment movant bears the initial burden of pointing out those portions of the record that show it entitled to judgment as a matter of law. *Thomas v. Wichita Coca–Cola Bottling Co.*, 968 F.2d 1022, 1024 (10th Cir.1992), *cert. denied*, 506 U.S. 1013 (1992). If the movant meets that burden, the non-movant must come forward with specific facts based on admissible evidence from which a rational fact finder could find in the non-movant's favor. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998).

The court regards the following facts to be uncontroverted for purposes of these pending motions.  In late July of 2010, LS and Kron

2

executed Contract 07-084 for Kron's purchase of LS's I.D. Pipe Blaster System ("System") for delivery to Russia. Kron is a German corporation while Kronstadt Ltd. is a Russian corporation. They are sister companies without a parent company. Kron was set up because foreign company dealings with a European company are "easier and more convenient." (Dk. 148-2, p. 42).

While LSI's contract was with Kron, Kronstadt had an agreement to sale a LSI-built blaster system to Lukoil. This latter agreement is dated January 19, 2010, and it contains no purchase price, no description of the specific equipment and no specifications. Lukoil later paid Kronstadt for the System. Kronstadt as principal entered an agency agreement with Kron as its agent dated January 4, 2010, which included the following provision:

> Under this Agreement, the Agent accepts obligation to execute legal or other actions under its own name but at expense of the Principal in order to purchase goods for the Principal (further "Actions") when the Principal makes such requests. Under this Agreement the Agent is responsible for each business deal that it makes with the third party, in spite of the presence of Principal's name in the deal, or if the Principal gets into business relationship with the third party in order to execute the deal.

(Dk. 156-12, p. 1). The defendant states it has received no translated documents showing that Kronstadt paid for and was assigned the system purchased by Kron. The plaintiff does not effectively controvert this statement.

The Kron/LSI Contract 07-084 required the System to be "available for delivery" F.O.B. in Wichita "no later than 14 weeks from date

3

of advance payment," and it did not permit partial shipment. (Dk. 150-4, p.

1). The contract specified a penalty for delay in making the System available

for delivery. *Id.* at p. 2, § 4.7. In October of 2010, the parties added

Addendum 1 to Contract 07-084 which extended the System's shipping date

to December 15, 2010. This addendum was worked out through emails

exchanged between the LS's sales manager, Tim Ens, and the import

manager of Kronstadt Ltd., Miss Olga Chikova ("Chikova"), but the

addendum was signed by others for LS and Kron. (Dks. 148-7; 150-4, pp. 9-

10).[1] On December 13, 2010, the parties added a signed Addendum 2 which

extended the shipping date to December 30, 2010.

On December 23, 2010, Tim Ens for LS emailed Chikova that the

shipping date would need to be pushed back to January 21, 2011, due to

vendor problems in providing a hydraulic unit. Chikova emailed back on

December 28, 2010:

> We understand that this is not your personal or your company's fault,
> but the situation is getting worse day by day.
> We were astonished by the dates you wrote to us last week, as that
> very morning we had assured LUKOIL that the blaster should be
> delivered two months later than agreed. As far as Russian Supply
> Contracts are very strict, and this week we have already delayed the
> delivery of your machine to the customer's facility, we have been
> consequently notified that we will be charged a penalty starting from
> this morning and till the date of delivery.
> . . . .
> As far as the Contract is signed by our representative office in
> Germany, further correspondence related to Contract details and
> Penalties will be probably held by Kron-CIS GmbH, i.e. Leola Kilt (or
> Irina Sondermann) with me (or our Financial Manager) in copy.

---

[1] Chikova is employed by Kronstadt but not Kron.

> Anyway we need to receive from you some kind of 'Progress report' twice a week (eg. Mon & Wed) until the blaster is shipped on a vessel and once a week until the blaster reaches Saint-Petersburg for us to have precise information in time and to be able to inform the customer and avoid serious conflicts in case any problems arise.
> . . . .
> Please confirm new dates according to your new delay . . . .

(Dk. 155-14, p. 2). Ens's email reply addressed these questions and demands and established dates for testing, sending the testing video, date of packing, date of dispatch, and date of shipment from New York. (Dk. 148-17). Ens also emailed progress reports with photographs on January 3 and 6, but he received no responses to them. Ens telephoned and learned that a Russian holiday extended through January 11.

On January 13, 2011, Mr. Gluzman with Lukoil called LSI about the delay and asked for an email explaining the situation. Ens sent an email addressing the delay and the current timeline. (Dk. 155-17). In response to Chikova's email that requested sending a suggested written letter from LSI to Lukoil addressing the delay, LSI's President and General Manager, Linda Weir-Energen, sent a letter to Mr. Gluzman, Director of Material, Procurement, and Supply for Lukoil. (Dk. 155-18).

Assembly of the System was completed on January 13, 2011, and the testing was completed over the next three days. There is a question of material fact over whether the testing established that the System was capable of cleaning pipes at the rate specified in the contract. LSI made a video of the final run-off in testing and emailed a link to this video on

January 16, 2011, with a request for immediate approval. (Dk. 148-12). On January 17, 2011, Chikova replied by email saying the customer had approved and requesting LSI to "continue with painting and packing." (Dk. 148-13). After the testing was completed, the System's lance was cut in two for shipment. On January 19 and 20, 2011, the System was loaded into three containers and shipped from LSI. Addendum 2 changed "delivery terms into CIF Saint-Petersburg, Russia (Incoterms 2000)." (Dk. 150-4, p. 10).

On January 14, 2011, Ens for LSI sent an email to confirm that a Spanish translator would be available for the technician being sent to Langepas, Russia, for the System's installation. LSI chose Rafael Villa Pezzat to be the technician, and Pezzat spoke only Spanish and could not speak or read English or Russian. Ens emailed Chikova on January 17, 2011, the following representation:

> Rafael Villa Pezzat understands limited English but for him that is not a problem. He worked for LS installing machines in Israel, UAE, Kazakhstan and a similar machine in Poland in the past ten years. He has 45 years of experience in the field installing machines. He knows machine operation very well.

(Dk. 148-20, p. 2). Pezzat traveled to the manufacturing site of the System and spent a couple days reviewing its operation. He was provided the Systems' operation and maintenance manuals in English and Russian when he left Wichita. Pezzat translated the English manuals into Spanish using Google. On March 28, 2011, Chikova emailed Ens requesting Pezzat's

telephone number, because she wanted to speak with Pezzat to determine his English language capacity and/or consider using one of their technicians who spoke Spanish.

A certificate of insurance was purchased for the shipment from New York to Saint Petersburg. It provided that losses were payable to LSI. (Dk. 148-22, p. 4). A copy of this certificate was sent to Chikova on March 2, 2011, in response to her email that said, "The blaster was sent on CIF Saint-Petersburg, i.e. with insurance. Please send us the copy of insurance policy, we are obliged to show it to customs at the arrival of the vessel (March, 9)." (Dk. 148-22, p. 3).

Chikova sent an email on April 12, 2011, stating that the shipped System had arrived in Saint Petersburg port on April 9 and that they were waiting for customs to provide clearance. (Dk. 155-19, p. 2). On or about April 18 or 19, 2011, the containers cleared customs, and notification was given Artur Nekrasov, a Logistics Manager for Kronstadt, Ltd. In performance of his duties to receive containers on behalf of Kron, Nekrasov opened the containers and took photographs of the damage he saw.[2] The photographs were sent to Chikova sometime later. The System was then loaded onto several trucks and transported to its final destination at Langepas, Russia. It arrived on April 25, 2011, and the System was unloaded by Lukoil employees.

---

[2] What the defendant cites from Chikova's deposition testimony does not controvert that Nekrasov observed damage and he took photographs of it.

On April 29, 2011, Chikova arrived in Langepas and took more photographs of the System to document the damage occurring during transportation.  When she returned to Saint-Petersburg on May 4, 2011, Chikova sent the photographs she had taken and those taken by Nekrasov to LSI's sales representative, Tim Ens. There is a question of material fact over whether the damage shown in Nekrasov's earlier photographs is the same as the damage seen later in Langepas, Russia. Chikova's email was the first indication to LSI that the System had been damaged in transit. LSI's email response to Chikova stated that the apparent damage should not prevent the System from operating and that parts would be sent for repairing the lance. Chikova testified that Kron could not file a claim against the insurance and did not file a claim after LSI said the damages would not affect the System. (Dk. 148-2, pp. 243-44). During the relevant time period, LSI did not notify the insurer's agent of the transportation damage done to the System.

On May 11, 2011, Pezzat arrived in Langepas to complete installation and set up the System. He observed that the System had not been installed and that there was more damage done to it than he had been told. After Pezzat informed LSI of this additional damage, LSI chose not to file an insurance claim. Though he did not see anyone actually damage the System, Pezzat opines that the Lukoil employees damaged the lance table in moving it. Of the seven days he spent in Langepas, Pezzat estimates four

days were spent repairing the System. When he left Langepas, Pezzat knew there were three things that still needed to be addressed:  (1) additional software so the System could operate in the automatic mode;  (2) some hose connections; and (3) a chain tensioner. Kronstadt did not assist Pezzat in efforts to obtain renewal of his work visa, and there is a factual dispute over its reasons for doing so.

In late May or early June of 2011, on LSI's recommendation, Kron hired Tommy Austin ("Austin") of Austin & Mazzei Service, Inc. to fix the tensioner, hose connections and program on the System. When Austin arrived, he started the machine and nothing worked, as the program was gone from the System. He downloaded the program from his computer and tested the System. Austin identified problems with flexing of a sheet metal chute and the alignment and design of the lance assembly. He also discussed the addition of protective guards in case a hose failed. After testing the System first in the manual mode, Austin changed to the automatic mode and observed problems with hoses getting caught and pulling loose, lance problems, and timing issues. Austin also observed later capacity problems with the elevator assembly and dust collector as the production rate increased. When Austin left on June 23, 2011, the System still had issues with the lance assembly, hoses, air pressure, and the elevator assembly. Austin spent some time in St. Petersburg identifying

what additional parts were needed to address these issues and to meet the specifications requested by Lukoil.

Three weeks later, Austin returned to Langepas to complete his work as Chikova informed him that all of his parts had arrived. When he got there, he discovered that not all of the needed parts had arrived and that the dust collector had been removed making it inoperable. Austin estimated that upon receipt of all the requested parts, he would need three weeks to get the System fully operational, tested, and adjusted. Without all the parts, Austin indicated the System would not operate automatically at the rates requested by Lukoil. He installed the parts that did arrive, reinstalled the old dust collector, and tested the System in the manual mode. While Austin was testing it an air hose disconnected, Chikova then informed Austin to stop his work and indicated the System would not be part of this facility. Chikova avers that "Lukoil informed Kron that it was cancelling its contract with Kron due to the damage, delay and anticipated cost that it would take to get the shot blaster operational." (Dk. 150-7, ¶ 54).[3]  Austin returned to the United States without completing his work and sent Kron a final typewritten report. In the report, Austin concludes that his modifications "had some success" but that there were still "issues with the lance feed hose getting caught" and then the hose "pulled loose from hose fitting causing shot to fly all over production area." (Dk. 150-15, p. 2). Chikova avers that the System never

---

[3] The defendant has not effectively controverted this statement. (Dk. 155, p. 7).

operated at the contract-specified rate of 9 pipes cleaned per hour. The defendant cites the testimony of Pezzat and Austin that the System was operational in the automatic mode, but their cited testimony does not address whether the System performed at the rate stated in the contract.

In a letter dated July 9, 2012, attorneys for Kron formally notified LSI of its failure to provide a System "in accordance  with the contractual agreement. (Dk. 160-4, p. 1). Kron, however, did not assert a claim or demand for rescission until its amended complaint filed on November 19, 2013, almost eleven months after filing suit.

## LS'S MOTION FOR PARTIAL SUMMARY JUDGMENT

### *Punitive Damages for Breach of Contract*

The defendant's motion opens with a challenge that the plaintiff may not recover punitive damages on a claim alleging no more than a breach of contract without an independent tort. The plaintiff concedes this legal proposition and maintains its claim for punitive damages is limited to tortious allegations of fraud and misrepresentations of fact. The court accepts the plaintiff's representations that it is not pursuing a punitive damage claim "in connection with its breach of contract claims" and that such a claim rests on the "independent tort of fraud and misrepresentation." (Dk. 156, p. 14). The court considers this issue moot in light of the plaintiff's representation.

*Kansas Law Governing Fraudulent Misrepresentations*

Whether fraud exists is generally a question of fact, and the elements making up an "action for fraud include an untrue statement of fact, known to be untrue by the party making it, made with the intent to deceive or with reckless disregard for the truth, upon which another party justifiably relies and acts to his or her detriment." *Bank of America, N.A. v. Narula*, 46 Kan. App. 2d 142, 158-59, 261 P.3d 898 (2011) (internal quotation marks and citation omitted).

*Fraudulent Misrepresentation as to System's Functioning and Testing*

The defendant next seeks summary judgment arguing the plaintiff lacks the evidence that the defendant committed fraud in representing that the System was "well functioning, well fabricated and well tested" (Pretrial Order, Dk. 135, p. 7). The defendant maintains this representation was true in that the System, when shipped, met all three qualities because it was built to specification and had been tested properly. Since the plaintiff chose not to send a representative to observe the System's testing, the defendant concludes the plaintiff has no evidence to show otherwise.

The plaintiff counters that LS's limited testing of the System did not confirm the System would perform at the contract-specified rate and that LS's video of the testing falsely represented the System as meeting the contract's specifications on the pipe-cleaning rate. The plaintiff also points to the defendant's design of a 40' lance which after testing had to be cut into

two pieces for shipping. Finally, the plaintiff cites Austin's report as identifying design deficiencies with the System that were not exposed in the limited testing and that kept it from operating at the desired rates.

The deposition testimony and affidavit cited by the defendant do not establish as a matter of uncontroverted fact that the System as tested and shipped was capable of performing at the pipe-cleaning rate and for the operational hours specified in the contract. Thus, the defendant is not entitled to summary judgment based on the argument that its representations were truthful. In its reply brief, the defendant argues for the first time the lack of evidence regarding fraudulent intent. Arguments raised for the first time in a reply brief are waived and will not be considered. *Water-Pik, Inc. v. Med-Systems, Inc.*, 726 F.3d 1136, 1159 n.8 (10th Cir. 2013).

### Fraudulent Misrepresentation on Shipping

The defendant argues that it made no misrepresentations regarding shipping and that its representations are not fraudulent in nature. Two of the shipping delays were the subject of contractual addendums, and the third delay was due to a vendor issue. The defendant contends "there was no representation at the time of the contract was entered into which was false or intended to mislead Kron-CIS in any way, and there has been no showing of any fraudulent intent on the part of Defendant." (Dk. 148, p. 13). The plaintiff does not respond to these arguments and does not point to

any genuine issues of material fact that would preclude summary judgment on this argument. The court grants defendant's motion as uncontested on this claim.

*Fraudulent Misrepresentation on Competent and Qualified Tech*

The defendant argues that it identified and discussed at length Mr. Pezzat, his language limitations, and his experience in installing LS equipment, including a similar machine, in other foreign countries. Because of these disclosures and because the plaintiff said it had a local technician who spoke Spanish, the defendant denies that it failed to disclose or misrepresented any material fact and also denies that the plaintiff relied on any purported misrepresentation. The plaintiff's response does not generate any controverted issues of material fact as to prevent summary judgment on this issue.

That Mr. Pezzat was not an in-house technician, that he had not witnessed the manufacturing of the System, that he did not have a Spanish version of the System manual, and that LS chose him for this project because, in part, of a relationship with one of its engineers are not facts which show a fraudulent representation here. Even Kron's negative opinion about Mr. Pezzat's general knowledge and performance does not evidence a specific fraudulent representation about Mr. Pezzat's experience and qualifications. The plaintiff's evidence fails to show that Mr. Pezzat's performance was so lacking as to demonstrate that the defendant

14

fraudulently represented his basic qualifications or competence in installing machinery of this kind. The defendant is entitled to summary judgment on this fraud claim.

*Fraudulent Misrepresentation on Shipping Insurance Contract*

The pretrial order lays out the plaintiff's theory on this claim to be the fraudulent misrepresentation "that LS would take the necessary steps to maintain a contract of insurance from Wichita to St. Petersburg." (Dk. 135, pp. 7-8). The defendant argues it is entitled to summary judgment because a contract of insurance was acquired consistent with the contractual shipping terms of "CIF-St. Petersburg" and a copy of this insurance was provided to the plaintiff while the System was being shipped. The defendant asserts any failure to collect on this insurance was due to the plaintiff not following through in pursuing a claim.

In response, the plaintiff does not dispute that there was an insurance contract issued consistent with the contract but now alleges that it was relying on the defendant to file a claim with the insurance carrier and points to the defendant as the named certificate holder on the insurance. The defendant replies that a fraud claim based on failure to file an insurance claim is new to the case and not included as a theory in the pretrial order. The court agrees that the plaintiff has not alleged and preserved such a claim in the pretrial order. The defendant is entitled to summary judgment on this claim.

15

*Real Party in Interest and Damages*

The defendant contends that Kron, as purchaser of the System from LS, has failed to show its sale or transfer of the System to Kronstadt. The defendant says it has not received in discovery from the plaintiff any translated documents showing such a sale, transfer or reimbursement between Kron and Kronstadt. The plaintiff acknowledges having received a copy of a contract between Kronstadt and Lukoil dated January 19, 2010, which lacks specifics on the price and product. As far as proof of damages, LS has received evidence of Kronstadt making a repayment to Lukoil that is tied to "certain invoices including a collateral agreement which is not included in the translated documents, a specification that is not included in the translated documents, or copies of the invoices." (Dk. 148, p. 18). LS says it has not received, however, proof that the repayment was charged back to the plaintiff Kron. Because Kron and Kronstadt are separate legal entities and because tort claims cannot be assigned, any tort claims belonging to Kronstadt cannot be assigned to the plaintiff Kron. Furthermore, the defendant says it has no evidence that Kronstadt assigned its breach of contract claims to Kron. The plaintiff contends these gaps in the translated documentary evidence produced during discovery keep the plaintiff Kron from proving it has been damaged. The defendant concludes:

> Plaintiff has now produced a body of 35 documents translated from Russian or German to English. (See, Exhibit B). Although the body of exhibits to be relied upon by Plaintiff could have included a variety of administrative proceedings in which Lukoil presented their

> various complaints to Kronstadt, Kronstadt and Plaintiff have chosen <u>not</u> to produce any of these documents in certified translation. Instead, Plaintiff has produced a translated version of PL0001435 which is the demand for payment of 2,600,000 rubles in delay damages; the contract between Lukoil and Kronstadt which purports to be the controlling contract between these companies in Exhibit B at pp. PL001441-PL001449, and various shipping documents. None of these documents establish any basis for Kronstadt paying damages to Lukoil or charging any part of its controversy with Lukoil back to Kron-CIS.

(Dk. 148, p. 19). In response, Kron counters that it is the real party in interest as the party to the contract who paid LS and as the entity to whom LS made the false representations. In reply, the LS acknowledges Kron's legal position as the real party in interest, but renews an argument that Kron cannot prove it suffered any damages.

The court will not grant LS's motion on this issue. The record does not show that Kron is bringing any assigned tort claims or that it is bringing any breach of contract claims other than as the purchaser of the System and as party to the contract. As for its other challenge to the plaintiff's proof of damages, LS's motion fails to carry the initial burden of pointing out those portions of the record that show it is entitled to judgment as a matter of law on this point. LS's motion does not articulate a statement of facts to support this burden and does not cite portions of the record that would sustain this burden. At best, LS's motion does no more than show that translated documents evidencing a sale, transfer or reimbursement between Kron and Kronstadt have not been produced in discovery. LS's motion fails

17

to demonstrate that this proposition necessarily means the plaintiff cannot prove it suffered damages for any of its claims.

**KRON'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

*Breach of Contract for Failure to Ship on or Before December 30, 2010*

As set forth in the pretrial order, Kron claims that LS breached their "contract when it failed to manufacture and ship the shot blaster to Kron on the date specified in the contract." (Dk. 135, p. 7). LS's stated position in the pretrial order is to deny it breached the contract. *Id.* at 9. The choice of law provision in the parties' written contract looks to Kansas law, (Dk. 148-4, p. 5), and both sides cite Kansas law respectively. The elements of a breach of contract claim in Kansas are: "(1) the existence of a contract between the parties; (2) sufficient consideration to support the contract; (3) the plaintiff's performance or willingness to perform in compliance with the contract; (4) the defendant's breach of the contract; and (5) damages to the plaintiff caused by the breach." *Stechschulte v. Jennings*, 297 Kan. 2, 23, 298 P.3d 1083 (2013) (citations omitted).

Addendum 2 to the parties' written contract extended the shipping date to December 30, 2010, and there were no other written addendums that extended this date. It is also uncontroverted that the System did not ship until January 19 and 20, 2011. Kron highlights this provision in their contract, "If Products have not been made available for delivery to the Buyers and/or failure to supply part of Products, the Sellers

18

shall pay to the Buyers a penalty at the rate of .2% of TCP for every day of delay but in no event shall the total of all such penalties exceed 10% of TCP." (Dk. 148-4, p. 3). The plaintiff seeks summary judgment on this claim.

In response, LS argues the plaintiff's motion "ignores communications between the parties" over a shipping date change due to a vendor problem. (Dk. 155, p. 18). As discussed above, LS exchanged emails explaining why the shipping date needed to be pushed back to January 21, 2011, and LS confirmed the new shipping date for the plaintiff's representatives. LS highlights Chikova's email of January 17, 2011, that replied to LS's email which had sent a link to the video testing of the System and had asked for "approval ASAP." (Dk. 148-12). Chikova's reply said the customer had approved and requested LSI to "continue with painting and packing." (Dk. 148-13). LS insists this means that the "delay was approved." (Dk. 155, p. 18). LS also argues that the plaintiff failed to reject the system for improper delivery and concludes that the plaintiff "is not entitled to summary judgment for breach of contract based on improper delivery." (Dk. 155, p. 19).

In reply, the plaintiff looks to their written contract which provides at section 11.2:

> With regard to the rights and obligations of the parties the present written Contract with Appendix 1 shall prevail. Possible contradictory statements, undertakings and the like of former correspondence, offers etc. are irrelevant. Any amendment of and supplement to the present CONTRACT 07-084 and/or Appendix 1, or specifications

thereof must again be made in writing by authorized representatives of each party in order to be valid.

(Dk. 148-4, p. 6). The plaintiff denies that the emails exchanged between Ens and Chikova evidences any written amendment to extend the shipping date or to modify other terms of their written agreement. Besides not being authorized representatives, Ens and Chikova did not send emails that indicated an amendment of any term to Addendum 2. Instead, Chikova's email expressly reserved:

> As far as the Contract is signed by our representative office in Germany, further correspondence related to Contract details and Penalties will be probably held by Kron-CIS GmbH, i.e. Leola Kilt (or Irina Sondermann) with me (or our Financial Manager) in copy. Anyway we need to receive from you some kind of 'Progress report' twice a week (eg. Mon & Wed) until the blaster is shipped on a vessel and once a week until the blaster reaches Saint-Petersburg for us to have precise information in time and to be able to inform the customer and avoid serious conflicts in case any problems arise.

(Dk. 155-14, p. 2). The plaintiff notes that the defendant has not offered any documentary evidence of a written amendment extending the shipping date or modifying the agreement's terms.

The plaintiff has carried its summary judgment burden on its breach of contract claim that the defendant failed to ship the System by December 30, 2011, as required by Addendum 2, and that the defendant is liable under § 4.7 of their agreement. The defendant's response does not create any genuine issues of material fact for a written amendment extending the shipping date and does not advance any legal arguments to preclude its liability for failure to make the System available for delivery

20

pursuant to the written agreement. Because the plaintiff did not present a statement of uncontroverted fact on the amount owed under this provision, the court's ruling on this remedy is not final in that respect.

*Revocation of Acceptance Remedy*

In seeking this remedy, Kron argues that the System's nonconformity to Kron's needs and circumstances at the time of the purchase substantially impaired its value to Kron and that Kron accepted the System either believing the System would be remedied promptly or not discovering the extent of the System's nonconformity. Specifically, when the first technician, Mr. Pezzat, left Russia in May, Kron alleges it believed the System needed to have software installed to operate in automatic mode and to have problems with hose connections and chain tensioner resolved. The arrival of the second technician, Mr. Austin, however, revealed additional problems with a flexing metal chute, the lance assembly, piping, hose connections coming loose. Kron contends these circumstances and the uncontroverted opinions of the technicians establish that System was nonconforming, that the nonconformity "substantially impaired its value to Kron, and that Kron was unaware of the nonconformities until after the repairs to the machine had been made, and after Austin's arrival with the necessary software program to test the machine in automatic mode." (Dk. 150, p. 19). The plaintiff also contends it gave timely notice of the System's

nonconformity and "ultimately revoked its purchase, at the latest upon the filing of this lawsuit." *Id.*

The defendant denies that the System had any functioning value to Kron but only to the final end-user, Lukoil, who is not a party to the action. The defendant maintains that the plaintiff first attempted to revoke its acceptance of the System with the filing of its first amended complaint on November 19, 2013, over two years after delivery of the System. The defendant denies that it received notice of the Kron's revocation of acceptance "within a reasonable time after" Kron's alleged discovery of the grounds for revoking. *See* K.S.A. 84-2-608(2). The defendant argues the questions whether Kron ever revoked acceptance and whether the alleged revocation was timely remain material questions of fact to be decided by the trier of fact. Finally, the defendant contends that the System did conform to the contract's specifications but that the additional problems noted by Austin came from Lukoil requesting modifications so the System would operate faster than contract specifications.

On its face, the plaintiff's summary judgment request on this remedy is riddled with genuine issues of material fact. Most notably are if and when the plaintiff revoked its acceptance and whether the revocation occurred within a reasonable time. The court is unable to find in the plaintiff's motion an uncontroverted fact establishing that the plaintiff notified the defendant of its revocation prior to filing the first amended

complaint. A revocation of acceptance is "not effective until the buyer notifies the seller of it." K.S.A. § 84-2-608(2).  A buyer's notification of a breach is one thing, but the buyer also must notify the seller "that it was revoking acceptance and canceling the contract, and the comments to section 84-2-608 indicate that mere notice of a breach under the preceding section is generally not sufficient to effect revocation of acceptance." *Genesis Health Clubs, Inc. v. LED Solar & Light Co.*, 2014 WL 2095170 at *2 (D. Kan. May 20, 2014) (citations omitted). For that matter, the plaintiff is in no position to demonstrate as a matter of law that its revocation occurred within a reasonable time after discovering the ground for revocation. This question of timeliness or reasonableness is a question of fact to be decided by the jury in consideration of the facts and circumstances here. *Scotwood Industries, Inc. v. Frank Miller & Sons, Inc.*, 435 F. Supp. 2d 1160, 1168-69 (D. Kan. 2006) (and cases cited therein). The plaintiff's motion is denied on this claim.

IT IS THEREFORE ORDERED that the defendant LS's motion for partial summary judgment (Dk. 147) is moot concerning any possible claim by Kron for punitive damages for breach of contract; is granted on Kron's fraud and misrepresentation claims regarding shipping by the deadlines provided in the contract, supplying a competently trained and qualified technician, and maintaining a contract of insurance during shipment from Wichita to St. Petersburg; is denied on the plaintiff's claim for fraud and

misrepresentation that the System would be well functioning, well fabricated and well tested; and is denied as to the LS's arguments related arguments on real party in interest and damages;

IT IS FURTHER ORDERED that the plaintiff Kron's motion for partial summary judgment (Dk. 149) is granted on its breach of contract claim for the defendant LS's failure to deliver the System by the date appearing in the written contract and the defendant's liability under § 4.7 of the written contract, but it is denied as to plaintiff's claim for revocation of acceptance.

Dated this 9th day of December, 2014, Topeka, Kansas.


s/Sam A. Crow
Sam A. Crow, U.S. District Senior Judge